*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

### Nos. 18-CF-0694 & 18-CF-1078

JAMES D. YOUNG & TYRONE HEIGHT, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(2014-CF1-015616 & 2014-CF1-015617)

(Hon. Milton Lee, Trial Judge)

(Argued April 28, 2022                    Decided November 30, 2023)

*Sam H. Zwingli,* with whom *Jeffrey T. Green* and *Kathleen Mueller* were on the brief, for appellant James D. Young.

*Cecily E. Baskir* for appellant Tyrone Height.

*David P. Saybolt*, Assistant United States Attorney, with whom *Channing P. Phillips*, Acting United States Attorney (at the time of argument), and *Chrisellen R. Kolb*, *John P. Mannarino*, and *Laura Crane*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, ALIKHAN, *Associate Judge*, and FISHER, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*: In these appeals, appellants James D.

Young and Tyrone Height challenge their convictions for felony murder and second-

degree murder while armed and related offenses resulting from, and following, the shooting death of Willard Shelton. They contend that the government's evidence against them was insufficient and they also challenge various evidentiary and motions rulings by the trial court.

We affirm appellants' convictions[1] and, in doing so, reject a majority of their challenges. First, we reject appellants' challenge to the sufficiency of the government's evidence, and conclude that the evidence before the trial court was sufficient for a rational jury to convict. Second, we reject appellants' challenge to the trial court's denial of their motion for a mistrial based on allegedly prejudicial testimony introduced at trial. We conclude the trial court did not abuse its discretion in determining that appellants were not unduly prejudiced. Third, we reject appellants' argument that their Sixth Amendment right to a fair trial by an impartial jury was violated by a juror's exposure to extrajudicial communications. Fourth, we reject appellants' argument that there was government misconduct during closing

---

[1] Mr. Young and Mr. Height were convicted by a jury of a total of eleven counts each: Robbery while Armed (D.C. Code §§ 22-2801, 22-4502);, Felony Murder while Armed (D.C. Code §§ 22-2101, 22-4502), Murder II while Armed (D.C. Code §§ 22-2103, 22-4502), First Degree Burglary while Armed (D.C. Code § 22-801(a), 22-4502), Tampering with Physical Evidence (D.C. Code § 22-723), Unlawful Possession of a Firearm with a Prior Conviction (D.C. Code § 22-4503(a)(1)); Obstructing Justice (D.C. Code § 22-722(a)(2)(A)), and four counts of Possession of a Firearm During a Crime of Violence (D.C. Code § 22-4504(b)) ("PFCV").

and rebuttal argument. Fifth, we reject Mr. Height's argument that his conviction for unlawful possession of a firearm violated his Fifth and Sixth Amendment rights, and conclude that all elements of the offense were satisfied. Sixth, we reject appellants' other challenges to the trial court's rulings concerning the redirect examination of witness Tiera Liverpool and the trial court's response to a jury note received during deliberations. Finally, we reject Mr. Height's independent challenges to the trial court's denial of various motions to suppress evidence as well as the denial of a pre-trial motion to sever, and affirm the trial court's rulings on those motions.

We agree with appellants that certain of their convictions merge; in particular (1) their conviction for second-degree murder while armed merges with their conviction for felony murder while armed; (2) their conviction for felony murder merges with the underlying felony (armed robbery); and (3) three of their four convictions for possession of a firearm during the commission of a crime of violence merge. However, we agree with the government that appellants' fourth conviction for possession of a firearm during the commission of a crime of violence does not merge. Further, we agree with appellants that the trial court retains discretion over how to effectuate the merger and resentence appellants on remand. Accordingly, we grant a limited remand to address the merger question consistent with this opinion.

## I.      Procedural and Factual Background

The following facts are undisputed.  During the early morning hours of August 31, 2014, appellant James D. Young, along with another individual, shot and killed Willard Carlos Shelton in the parking lot of the Wellington Park apartment complex in the southeast quadrant of Washington, D.C.[2]  Mr. Young and the other man subsequently removed property from Mr. Shelton's person and entered a nearby apartment unit without permission.

The government indicted Mr. Young for various murder, robbery, burglary and weapons-related offenses resulting from this series of events as well as for obstruction of justice based on a recorded jail call that the government alleges was Mr. Young's effort to suppress witness testimony by ordering a hit on a key government witness.  The government also indicted appellant Tyrone Michael

---

[2] The Wellington Park apartment complex is located on the 2500 block of Pomeroy Road, SE, in Washington, D.C.  Pomeroy Road borders the complex on the north side whereas Elvans Road borders it on the south side.  The complex consists of multiple buildings, known by their street address as 2500, 2502, 2504, 2506, 2508, 2510, 2512, and 2514, or in shorthand by the last two digits of each address (i.e., "12").  These buildings surround a parking lot that is accessible by car only through a single driveway.  There is one pedestrian staircase into the complex from Elvans Road.  A high wall separating it from neighboring communities and preventing pedestrian transversal otherwise surrounds the complex.

Height[3] for identical offenses related to the shooting of Mr. Shelton on the theory that Mr. Height was present with, and an accomplice to, Mr. Young at Wellington Park. Mr. Height was additionally indicted for obstruction of justice for allegedly conspiring with a fellow incarcerated individual to provide a false statement to the government exculpating him for the events at Wellington Park.

Appellants Mr. Young and Mr. Height were tried jointly before a jury. The government's theory at trial was that appellants robbed, assaulted, and killed Mr. Shelton when he came to buy PCP from Mr. Young. Mr. Young, testifying in his own defense, presented a self-defense case, arguing that Mr. Shelton was an aggressor, high on PCP, and that he only sought to recover his own property that Mr. Shelton possessed. Mr. Young did not directly implicate his co-defendant as a part of his defense. Mr. Height did not put on evidence, but he argued that he was not present for these events. The jury convicted appellants of all counts, although they were acquitted of premeditated first-degree murder while armed and convicted instead of second-degree murder while armed, a lesser-included offense.

---

[3] Mr. Height's name appears in various forms in the record. He was indicted as "Tyrone Height" and his aliases were listed as "Mike Mike" and "Mikey." The Judgment and Commitment Order lists his name as "Tyrone Height." The captions of the official trial transcripts alternately use "Michael Hight" and "Tyrone M. Hight." The parties mutually agreed to use "Tyrone Michael Hight" for the jury verdict forms. We use "Mr. Height" for consistency.

## II.     Sufficiency of the Evidence for Felony Murder While Armed and Second-Degree Murder While Armed

Appellants argue that the government failed to prove beyond a reasonable doubt that they were guilty of felony murder while armed as well as second-degree murder while armed.  The felony murder charge was premised on the theory that appellants shot and killed Mr. Shelton while committing or attempting to commit robbery.  Mr. Young separately argues that the government failed to disprove self-defense for the charge of second-degree murder while armed.  The government argues that the evidence was sufficient to support appellants' convictions and disprove self-defense.  We agree with the government that the evidence was sufficient for a rational jury to convict appellants of felony murder while armed and second-degree murder while armed and that the government disproved self-defense as to Mr. Young.

We review challenges to the sufficiency of the evidence by viewing "the evidence in the light most favorable to the government, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Lucas v. United States*, 240 A.3d 328, 343 (D.C. 2020) (quoting *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017)).  We will affirm if, after reviewing the evidence in the light most favorable to the government, "any rational

fact-finder could have found the elements of the crime beyond a reasonable doubt." *Id.* (quoting *Hernandez v. United States*, 129 A.3d 914, 918 (D.C. 2016)). "[T]he evidence in a criminal prosecution must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc). "The evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Id.* (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)).

A rational jury could have convicted appellants of felony murder while armed and second-degree murder while armed. Viewing the evidence in the light most favorable to the government, as we must, the record supporting these convictions was as follows. On the morning of August 31, 2014, Mr. Shelton placed three unanswered calls to Mr. Young. At 6:50 a.m., as recorded by a crime camera maintained by the D.C. Metropolitan Police Department, Mr. Shelton, in his blue Chevrolet Trailblazer, entered the Wellington Park property.

At around 7:00 a.m., Victoria McRae, who lived at 2512, awoke to the sound of gunshots. She went to the window and saw two men shooting at Mr. Shelton. She saw each of the shooters with a "handgun," but she did not see Mr. Shelton holding a firearm or anything else. Although she did not personally know Mr. Shelton, she recognized the two shooters from the community and identified them

as "Dink" and "Mike," nicknames for Mr. Young and Mr. Height, respectively. Ms. McRae identified appellants twice: first, in a written statement to the Wellington Park property manager; and second, in an interview with the Metropolitan Police Department ("MPD"). She also testified that she witnessed Mr. Young "tak[ing] [Mr. Shelton]'s belongings out his pockets" including "[a] wallet" and "some keys."

Tiera Liverpool, a resident of 2514, was also a witness to the events. She was standing in her window smoking marijuana when she saw Mr. Young, whom she identified as Dink, and a second man interacting with a "larger man." She knew Mr. Young through family connections at Wellington Park. Although she did not know the larger man by name, she had previously seen him in the Wellington Park parking lot smoking PCP. The government contended that the second man was Mr. Height and the larger man was Mr. Shelton.[4] Ms. Liverpool testified that she heard the second man, Mr. Height, "arguing at Dink about telling him to check the dude's pockets" as if it were an attempted robbery. However, Mr. Young "didn't want to check his pockets, but he kept asking him where the money was at." She then heard the shooting and saw Mr. Young and Mr. Height approaching her building. At that time, she saw Mr. Young with a gun. With her ears by the door, she overheard a conversation between Mr. Young and Mr. Height during which Mr. Young said,

---

[4] Viewing the evidence in the government's favor, we accept the government's contention concerning the identities of these men.

"you didn't have to shoot him first." and Mr. Height replied, "you should have just checked his pockets."

Appellants' argument that this record is insufficient to support their convictions is unpersuasive. Mr. Young's argument rests on the notion that the testimony of the government's witnesses was not credible. However, we give "full play to the right of the jury to determine credibility." *Walker v. United States*, 167 A.3d 1191, 1201 (D.C. 2017) (quoting *Gibson v. United States*, 792 A.2d 1059, 1065 (D.C. 2002)). Furthermore, "the evidence need not negate every possible inference of innocence." *Id.* (internal quotation mark omitted) (quoting *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000)).

Mr. Young further contends that the government did not "show more than mere coincidence of time and place between the wrongful act and the death," or that the killing "occurred as part of the perpetuation of the crime, or in furtherance of an attempt or purpose to commit it." (quoting *United States v. Heinlein*, 490 F.2d 725, 736 (D.C. Cir. 1973) (internal quotation marks omitted)). However, based on the testimonies of Ms. McRae and Ms. Liverpool, the jury could have concluded that Mr. Shelton went to the parking lot to buy PCP, that Mr. Young and Mr. Height attempted to rob Mr. Shelton, that Mr. Young and Mr. Height shot at Mr. Shelton when he failed to give them money, and that Mr. Young went through Mr. Shelton's pockets and took his wallet and keys.

A jury crediting the foregoing testimony supporting appellants' guilt could have concluded that the shooting was an outgrowth of the robbery, and not that the robbery was secondary to the shooting. Despite Mr. Young's contention that there was evidence to the contrary, we do not consider whether another jury could have reached a different outcome, only whether, in viewing the evidence in the light most favorable to the government, there was sufficient evidence in the record for the jury to find the elements of felony murder while armed and second-degree murder while armed beyond a reasonable doubt. Because there was sufficient evidence in the record for the jury to find the necessary elements, we conclude that the government proved, beyond a reasonable doubt, that appellants were guilty of felony murder while armed and second-degree murder while armed.

We are also unpersuaded by Mr. Young's argument that the government failed to disprove self-defense with respect to the charge of second-degree murder while armed. Mr. Young is correct that "the government bears the burden of disproving self-defense beyond a reasonable doubt." *Millhausen v. United States*, 253 A.3d 565, 569 (D.C. 2021) (citing *Rorie v. United States*, 882 A.2d 763, 776 (D.C. 2005)). However, this question turns on what evidence the jury chose to credit. We view the evidence in favor of the verdict. *Millhausen*, 243 A.3d at 568-69. During trial, the government elicited substantial evidence from Mr. Young that he had lied on numerous occasions about the shooting incident—including when he was

interviewed by detectives in 2014. Mr. Young also testified that it was his "natural instinct" to lie to the police, but that he "[n]ever lied to the jury." A jury, discrediting Mr. Young's testimony that Mr. Shelton instigated the shooting by attempting to strike him with his revolver could find the government disproved self-defense. Further, a jury that credited the government's evidence that Mr. Young and Mr. Height instigated the conflict and that Mr. Shelton did not brandish a gun or fire a shot, could find that the government disproved self-defense.

### III.    Denial of Appellants' Motion for a Mistrial

### A.    Additional Factual Background

In his opening statement, Mr. Height's counsel asserted that Ms. McCrae "cashed in" on the government's provision of temporary housing with heat, water, and air conditioning[5]—paid for by the government. On cross-examination, Ms. McCrae testified that, in 2014 and 2015, the government paid for her transportation and food. While Ms. McCrae did not recall the amounts and timing of the payments, appellant's counsel noted weekly payments of about $1,000 from September 10, 2014 through November 2014, and weekly payments of about $750 from December 2014 through March 2015. Ms. McCrae also received payments in April and May 2015. According to appellant's counsel, Ms. McCrae's desire to move, coupled with

---

[5] Ms. McCrae's utilities had been shut off at the time of the shooting.

the government's financial support, undermined her credibility by giving her "incredible motive to fabricate" her testimony.

Later, as part of its case-in-chief, the government presented the testimony of MPD Detective James Tyler. Detective Tyler had obtained Ms. McRae's identification of appellants as the shooters and assisted with relocating Ms. McRae to temporary housing. During direct examination, the following exchange occurred:

> Q: Now, to your knowledge in this case, did Ms. McRae stay in temporary housing for a relatively lengthy period of time?
>
> A: Yes.
>
> Q: And why, in fact, was it that Ms. McRae was placed into temporary housing for this extended period?
>
> A: We learned that a possible threat on her life was –
>
> [Counsel for Mr. Height]: Objection.
>
> The [trial court]: Sustained. Come to the bench.
>
> [. . .]
>
> [Counsel for Mr. Height]: I move for mistrial, Your Honor.
>
> [. . .]
>
> [Counsel for Mr. Young]: I join.

Appellants argued to the trial court that Ms. McRae was not aware of the threats and Detective Tyler's answer implied to the jury that appellants made the threats. In response, the trial court pressed the government to explain the need for the testimony regarding threats and extended housing, especially when Ms. McRae did not

personally know about the threats. The government responded that because appellants had attempted to impeach Ms. McRae's credibility on the grounds that she was provided temporary housing by the government, it wanted to explain to the jury why she remained in temporary housing for an extended time. The government ultimately yielded to the court, acquiescing that prior testimony indicating that Ms. McRae asked to move was sufficient.

The trial court then asked appellants' counsel why a curative instruction would not suffice to remedy the limited testimony. In response, appellants' counsel stated that Detective Tyler's response was highly inflammatory because it implied that appellants were "somehow responsible for or connected to a threat on [Ms.] McRae's life" and that she was aware of the threat. Mr. Young's counsel also indicated that when Detective Tyler referred to a threat, counsel was looking at the jury and "it was like somebody exploded a bomb." The trial court noted that it was also looking at the jury when the statement was made but did not observe the same reaction, or at least that a reaction was not readily apparent. The trial court then afforded appellants' counsel and the government the opportunity to propose a cautionary instruction via email overnight. The jury was excused and trial was then adjourned until the next day.

Mr. Young's counsel filed a written motion for mistrial indicating that he believed no cautionary instruction could cure the injury. In the alternative, both

defense counsel requested that the jury not be instructed so as not to highlight the testimony any further. Before seating the jury for the day, the trial court denied the motion for mistrial and, as requested by appellants, did not give a curative instruction. The trial court determined that:

> [t]he statement that there were possible threats against her is not a factually inaccurate statement for much later on in the case. The difficulty created by the information imparted by the detective is it suggested that that may have been the reason for the initial move, and that simply is not an accurate reflection of the evidence in this case.

> And there's no indication that Ms. McRae was ever aware of any threats that may have been made. And then, lastly, there's the concern that one might speculate that the threats referenced by the detective may be attributable to Mr. Young and to Mr. H[e]ight.

> Certainly, the evidence in this case reflects that there were conversations made by Mr. Young while he was incarcerated with members of his family about Ms. McRae. There's nothing to suggest that Ms. McRae was ever aware of that.

> I was prepared to give a limiting instruction today to try to cure the concerns that I've now outlined, it was not going to be in line with what the [g]overnment suggested, because the [g]overnment's suggestion, in my view, was just wholly incorrect.

> [. . .]

It's not true as it relates to the initial move, but it certainly is true as it relates to the issue that was raised later on, and the reasons for the extended stay.  At your request, I will not give curative instruction, but I also will not grant a mistrial at this time.

There was a single question asked and there was a response by the witness.  It was not highlighted.  It was in the context of a greater discussion.  And to the extent that there is any concern or prejudice that may have been created by that singular response, the instruction, in my view, would have addressed that in a more appropriate fashion.  But, I will defer to the defense and their position, and simply will not give an instruction.

In addition to the trial court's determinations, we note that Mr. Young's presence at the shooting was attested to by Ms. McCrae, Ms. Liverpool, and Ms. Rose Miller; and he admitted to being at the scene as part of his self-defense claim.  Mr. Height's presence was corroborated by evidence from a GPS monitor attached to his ankle by a government agency which placed him at the scene.  *See infra "A. Denial of Pre-Trial Motion to Suppress GPS Evidence*."

### B.     Analysis

Our review of the denial of a motion for a mistrial is deferential.  *See Trotter v. United States*, 121 A.3d 40, 53 (D.C. 2015) ("The decision whether to grant a mistrial motion in lieu of alternative relief in response to a prejudicial development at trial is committed to the trial court's discretion."); *see also Bost v. United States*,

178 A.3d 1156, 1204 (D.C. 2018) ("A mistrial is subject to the broad discretion of the trial court and our review is deferential.") (brackets omitted) (citing *Van Dyke v. United States*, 27 A.3d 1114, 1122 (D.C. 2011)). "We are only inclined to reverse in extreme situations threatening a miscarriage of justice." *Holmes v. United States*, 143 A.3d 60, 67-68 (D.C. 2016) (internal quotation marks omitted) (quoting *Gordon v. United States*, 783 A.2d 575, 583 (D.C. 2001)). To determine whether a mistrial was necessary, we consider:

> the gravity of the misconduct, the relative strength of the government's case, the centrality of the issue affected, and any mitigating actions taken by the court, all while giving due deference to the decision of the trial judge, who had the advantage of being present not only when the alleged misconduct occurred, but through the trial.

*Trotter*, 121 A.3d at 53 (quoting *Bennett v. United States*, 597 A.2d 24, 27 (D.C. 1991)).

We conclude that the trial court did not abuse its discretion in determining that these factors weigh against granting a mistrial. First, as noted by the trial court, the alleged misconduct consisted of a single question and single response within the context of a larger discussion that was not highlighted to the jury. Second, the government's case against appellants was strong, consisting of testimony from multiple eyewitnesses, who were familiar with appellants, which placed appellants

at the scene as well as other evidence. Further, Mr. Young corroborated his presence through his own testimony and Mr. Height's presence was corroborated by evidence from his GPS monitor. Third, the testimony that was the basis for the motion for a mistrial was not about a central issue at trial. Although Ms. McRae's credibility was important to the government's case, the jury had other evidence before it supporting her reasonable fear of retaliation, which was relevant to explain the reason she accepted housing assistance. *See Mercer v. United States*, 724 A.2d 1176, 1191-94 (D.C. 1999) (holding that the trial court did not err in admitting evidence that a witness entered the witness protection program due to an alleged threat on her life on direct examination in anticipation of defense counsel's suggestion that the witness entered witness protection program for financial gain). Fourth, the trial court's decision to not provide a curative instruction abided by appellants' counsels' request so that Detective Tyler's response would not be further highlighted. The decision not to grant a mistrial was a reasonable exercise of discretion, where the judge noted he thought an instruction would resolve the issue but deferred in consideration of appellants' concerns.

Appellants raise for the first time on appeal an additional argument that they were prejudiced by the admission of this testimony because it allowed the government to argue in rebuttal that Ms. McRae received financial assistance from the government in response to her security concerns. Appellants take issue with

statements such as "Ms. McRae received financial assistance because she had security concerns, isn't that reasonable?" and "Was putting her into temporary housing too much? Keep in mind that there's evidence that his client . . . was talking about silencing Ms. McRae." Appellants did not object to these statements at trial, therefore we review to determine whether there was plain error, which is "(1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Otts v. United States*, 952 A.2d 156, 161 (D.C. 2007) (quoting *Marquez v. United States*, 903 A.2d 815, 817 (D.C. 2006)). Allegations that the government made improper closing statements require us to "first determine whether the challenged statements . . . viewed in context, were, in fact, improper." *Bost*, 178 A.3d at 1190. When reviewing the government's closing statements for plain error, "we reserve reversal to particularly egregious situations." *Atkins v. United States*, 290 A.3d 474, 485 (D.C. 2023) (internal quotation marks omitted) (quoting *Portillo v. United States*, 62 A.3d 1243, 1257 (D.C. 2013)).

The government's statements in rebuttal do not constitute reversible error because they were not improper; therefore, there was no error, let alone plain error. First, the government's statements were supported by the record. There was evidence in the record, including testimony from Ms. McRae that she wanted to move because she was concerned about her safety as a result of identifying Mr.

Young and Mr. Height. Likewise, there was evidence in the record that Ms. McRae remained in temporary housing for an extended period of time because of the government's knowledge of threats against her. Accordingly, because the government's statements were supported by the record and were relevant to support Ms. McCrae's credibility, they were not improper.

Second, the government's statements were not otherwise misleading. When reviewing the government's statements during closing arguments, the "court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning, or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Ashby v. United States*, 199 A.3d 634, 666 (D.C. 2019) (quoting *Perez v. United States*, 968 A.2d 39, 80 (D.C. 2009)). Likewise, any concern over an arguable overstatement will be remedied by an instruction to the jury that their recollection controls. *Dixon v. United States*, 565 A.2d 72, 79 (D.C. 1989) ("The judge's routine instruction to the jurors that their recollection controls was, in our view, sufficient to remedy any arguable overstatement."); *Shepherd v. United States*, 144 A.3d 554, 563 (D.C. 2016) ("The jury is presumed, unless the contrary appears, to follow the instructions, and we find nothing in the record to suggest the jury did not do so." (quoting *Sherrod v. United States*, 478 A.2d 644, 659 (D.C. 1984))); *see Dixon*, 565 A.2d at 79 n.12

("Indeed, the prosecutor himself reminded the jurors during his rebuttal argument of their primacy with respect to recollection of the testimony.").

Here, read in context, the government's rebuttal statement does not unfairly conflate the issues of why Ms. McRae initially moved and why the government provided her with extended housing assistance. Additionally, the government's rebuttal statement did not improperly suggest that Ms. McRae initially wanted to move due to her knowledge of the threats against her, which might be unduly suggestive with respect to the obstruction of justice charge against Mr. Young. Mr. Height contends in his supplemental brief that, even though he did not do anything to threaten McCrae's safety, he may have been prejudiced by Detective Tyler's statements as they were the last thing the jury heard before being dismissed for the day. He argues that, in light of his obstruction of justice charge, the jury could have interpreted Detective Tyler's statements to mean that he was involved in the threat to Ms. McRae. However, any such potential prejudice was not significant enough to warrant reversal because, while the testimony could have suggested that he threatened Ms. McCrae, the trial court deferred to appellants' counsel's request that no cautionary instruction be given so as not to highlight the testimony any further.[6]

---

[6] The court gave appellants counsel and the prosecution the opportunity to propose cautionary instructions via email.

We conclude that there was no overstatement of the evidence and that both the trial judge and the government reminded the jurors that their recollection controlled. The trial court determined that there was nothing to suggest that Ms. McCrae was aware of any threats against her from either appellant, Detective Tyler's statement was not highlighted and was in the context of a greater discussion, and no curative instruction was given because of the defense's position—despite the court's assessment that an instruction would have been more appropriate. All together, we view this as sufficient to conclude that the trial court did not commit plain error when it failed to intervene in the prosecutor's argument sua sponte.

## IV.    Motion to Strike Juror 534

### A.    Additional Factual Background

During the trial, on March 19, 2018, the Deputy Chief of Security for the Superior Court ("Deputy Chief") notified the trial judge that she had been approached by Juror 534 after church service the prior day. The juror had approached the Deputy Chief because she "was scared" as a result of a conversation she overheard in the courthouse between an audience member and court security. In response, the trial court conducted a voir dire of Juror 534, with counsel for all parties present.

Juror 534 identified two issues of concern. First, she had overheard a member of the audience having a conversation with court security while she was getting water

for another juror. Juror 534 paraphrased the audience member's comment to court security twice. She first characterized the gentleman as saying, "[W]ell, he let her go; nobody gives an F about her; she can choke and die." Later, she paraphrased it as, "I was in there coughing and they didn't offer me no F-ing water; nobody gives an F about them; they sitting in there listening to these lies." The juror described court security as "out there, basically, like, kiki-ing. And I'm like, you're having conversations with them, and I felt uneasy." The juror was alone at the time and did not believe the comment was directed at her, but, rather, at the jury generally. Second, the juror felt like audience members were "watching" the jury as they left the building. She did not report any contact between the audience and other members of the jury.[7]

The court determined—and the juror agreed—that none of the incidents were "connected to Mr. H[e]ight or Mr. Young." In response to the court's probing questions about her ability to remain impartial, the juror said that she "prayed about it" and believed that the incidents would not impact her ability to be fair and impartial "at all." After the court had its colloquy with Juror 534, the judge offered

---

[7] The juror also described an incident involving a note left on her car while it was parked at a store near her home. The trial judge's only finding relating to the note was that it was not connected to appellants. From the record, it appears to have been an attempt by an unrelated third party to strike up a romantic relationship with the juror.

counsel the opportunity to question her. The government had no questions. Counsel for both Mr. Young and Mr. Height questioned the juror about her concerns.

Following the colloquies, counsel for Mr. Young and Mr. Height expressed concern about Juror 534 remaining on the panel. Counsel for Mr. Height observed that it was "too great a risk . . . for her to remain on the jury," that she was "biased," and her exposure to these statements "taint[ed] her ability to be fair and impartial." Counsel for Mr. Young also described her as "tainted" and did not think "she [could] be fair and impartial." Counsels for Mr. Young and Mr. Height moved to strike Juror 534. In addition to saying that Juror 534 was not tainted, the government expressed concerns that if the court struck the juror, it would open an avenue for the defense to "force a mistrial by allowing this type of behavior to continue."

The trial court, relying on this court's decisions in *Richardson v. United States* and *Al-Mahdi v. United States*, found that the juror could remain impartial and denied the motion to strike. 893 A.2d 590, 595, 598 (D.C. 2006) (no abuse of discretion to deny mistrial after jurors reported "uncomfortable" and "deliberate" eye contact from defense witnesses); 867 A.2d 1011, 1018-20 (D.C. 2005) (no abuse of discretion to deny mistrial where juror was approached at a bus stop by a young

family member of the defendant; juror reported being "really scared" but overcame that fear after prayer).[8]

## B.    Analysis

Appellants argue that the trial court's failure to strike Juror 534 violated their Sixth Amendment right to a trial by an impartial jury. Appellants contend that what the juror experienced in the instant case was "more severe" than in *Richardson* and *Al-Mahdi*. First, they note that the jurors in *Richardson* described the eye contact as non-threatening. Second, they argue that direct contact with a child, as in *Al-Mahdi*, is inherently less threatening than overhearing negative comments from an adult audience member. Third, they note that Juror 534 testified to being "frightened" and that the juror modified her behavior by arranging alternate transportation and approaching courthouse security at church, which showed the strength of her fear. Fourth, they contend that because appellants faced obstruction charges, the juror's experience meant "she could [not] fairly evaluate the obstruction charge."[9] Fifth,

---

[8] While these parentheticals refer to a mistrial, in our present case, no mistrial would have been necessary because the jury had not yet begun deliberating and the ameliorative action would have been to replace the juror with an alternate, if necessary.

[9] In his original brief Mr. Young argues that the juror made claims regarding witness intimidation, which also escalated the nature of the juror's taint. However, as the government notes, only the Deputy Chief's second-hand account mentioned witness intimidation.

they argue that the court failed to consider all the relevant circumstances and merely credited the juror's assurances that she could remain impartial.

The government argues that the court did not abuse its discretion when it declined to dismiss the juror after a "careful, thorough, and probing" examination. The government notes that the court stressed to the juror that there was no connection between appellants and the comment outside the courtroom. The government also notes that, crediting the juror's statements that she did not speak with other jurors about her concerns, the trial court concluded that the information did not reach the rest of the jury, so the possibility of taint did not extend beyond Juror 534. The government further argues that the court's investigation supported the finding that the juror could remain fair and impartial and that "potential . . . prejudice was vitiated by the court's limiting instruction and the court's finding that the juror had overcome her fear." Finally, the government argues that under *Tann v. United States*, 127 A.3d 400, 471 (D.C. 2015), an obstruction charge does not "render the court's careful inquiry and findings insufficient."

We review a trial court's determination of juror bias for abuse of discretion. *Hill v. United States*, 622 A.2d 680, 683-84 (D.C. 1993) ("[A]ppellant's burden is not light . . . , 'following a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion . . . .'" (brackets omitted) (quoting *Leeper v. United*

*States*, 579 A.2d 695, 698 (D.C. 1990))).  The remedy for a claim of juror bias is "a hearing to determine whether the allegation of bias has merit."  *Richardson*, 893 A.2d at 596 (quoting *Al-Mahdi*, 867 A.2d at 1018).  The allegation is subject to a burden shifting analysis.  *Headspeth v. United States*, 285 A.3d 1236, 1242 (D.C. 2022).  The defendant has the initial burden of establishing "substantial likelihood of actual prejudice from the unauthorized contact."  *Al-Mahdi*, 867 A.2d at 1018 (quoting *Hill*, 622 A.2d at 684).  If the defendant makes a prima facie showing of bias, the burden shifts to the government to show that the "contact with extraneous information was harmless."  *Id.* at 1019.  Relevant factors "includ[e] the nature of the communication, the length of the contact, the possibility of removing juror taint by a limiting instruction, and the impact of the communication on both the juror involved and the rest of the jury."  *Jackson v. United States*, 97 A.3d 80, 84 (D.C. 2014) (quoting *Al-Mahdi*, 867 A.2d at 1019).  Failure to strike a biased juror "constitute[s a] structural error requiring reversal."  *Johnson v. United States*, 701 A.2d 1085, 1092 (D.C. 1997); *Poth v. United States*, 150 A.3d 784, 789 (D.C. 2016).

Here, appellants failed to carry their initial burden to show substantial likelihood of actual bias.  As in *Al-Mahdi*, Juror 534 reported that she was initially scared but, through prayer and reflection, was able to overcome that fear.  Further— in contrast to *Al-Mahdi*—the juror here merely overheard a conversation, which did not appear to be directed at the juror herself, whereas in *Al-Mahdi*, the juror was

directly confronted by a member of the defendant's family. In order to conclude there was an abuse of discretion for failure to strike a juror, this court has required more than what the record shows in the instant case. *See, e.g.*, *Hill*, 622 A.2d at 685-686 (reversing trial court after juror visited scene to "draw his own conclusion" about "important, even central" evidence; concluding that the juror had "declared himself of two minds") (brackets omitted); *Johnson*, 701 A.2d at 1091 (finding juror was biased due to friendship with a close friend of the victim's family). Appellants' argument that the court did not take into account the relevant circumstances lacks merit; the court was careful and probing in addressing each of the *Al-Mahdi* factors, which take into account circumstances beyond just the juror's declaration of impartiality. Accordingly, there was no abuse of discretion in allowing Juror 534 to remain empaneled.

## V. Allegations of Prosecutorial Misconduct

### A. Unpreserved Challenges to the Prosecutor's Statements

For the first time on appeal, appellants raise several claims of prosecutorial misconduct which they contend warrant reversal. We review allegations of prosecutorial misconduct not first raised before the trial court for plain error. *Wills v. United States*, 147 A.3d 761, 767 (D.C. 2016). As previously stated, under plain error review, an appellant is required to show that a trial court's allowance of evidence was "(1) error, (2) that is plain, (3) that affects substantial rights." *Otts*,

952 A.2d at 161 (quoting *Marquez*, 903 A.2d at 817). An error is plain when it is "clear or obvious, rather than subject to reasonable dispute" under current law. *In re Taylor*, 73 A.3d 85, 99 (D.C. 2013) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). "If all three [mentioned] conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Portillo v. United States*, 62 A.3d 1243, 1258 n.17 (D.C. 2013) (quoting *Thomas v. United States*, 914 A.2d 1, 8 (D.C. 2006)).

When we evaluate claims of prosecutorial error, particularly to challenged statements from the prosecutor, we first determine whether the statements were improper. *Bost*, 178 A.3d at 1190. If error has occurred, then we consider whether "substantial prejudice" resulted. *Powell v. United States*, 455 A.2d 405, 411 (D.C. 1982). The determinative factors for assessing whether there has been substantial prejudice include "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Id. See Atkins*, 290 A.3d at 485 (In a plain error posture, we reserve reversal "to particularly egregious situations," leaving us to determine if a failure to cure allegedly improper comments "was 'so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial.'" (quoting *Portillo*, 62 A.3d at 1257 and *Andrade*

*v. United States*, 88 A.3d 134, 140 (D.C. 2014) (quoting *Ball v. United States*, 26 A.3d 764, 772 (D.C. 2011)).

### 1. Prosecutor's Statements During Initial Closing Argument

Appellants argue that during closing argument the government improperly asserted that Mr. Young had testified that he had an inclination to lie. They assert that, to the contrary, Mr. Young only testified that it had been his "natural instinct" to lie to the police officers when he was interviewed by detectives in 2014, but that he had "never lied to the jury."

During trial, Mr. Young testified that he was untruthful when interviewed by police when he stated:

> Me knowing that I took a life or life got tooken (sic) and I was responsible for it, I didn't want to tell the truth. I didn't want to. My natural instinct was to – because the police was saying stuff like if you know who killed this guy going to get 50 years and me knowing what's going on, I wasn't trying to tell the truth. It was just my natural instincts.

Mr. Young also affirmatively responded, "Yes, it was" to his attorney's question about it being his natural instinct to lie in the interview. During cross-examination, the government asked Mr. Young if he would also lie to the jury given his admission to lying numerous times before. He responded that he was no longer desperate, that his testimony was under oath, and that he was not trying to make things worse.

Specifically, he testified, "I never lied to the jury. None of them"; "Never lied to the jury, but I lied before because it's my life and just natural instincts is just not say I did it." Mr. Young also admitted to lying in a letter to a judge regarding the case.

The prosecution's closing statements highlighted Mr. Young's admission to previously lying, stating:

> Mr. Young, for his part, made statements to the police in a desperate attempt to try to talk his way out of it. You heard what he said, his natural inclination was to lie. He said, I thought I could talk myself out of it. Talk my way out of the case against him.
>
> [. . .]
>
> Consider his motive. He's facing a serious charge in this case. He told you that he would say anything to try to get out from underneath this case. He told you that his natural inclination was to lie. Is that somebody whose testimony that you're going to credit? Is that somebody that you would believe?
>
> [. . .]
>
> Ladies and gentlemen, the government is not asking you to sponsor James Young's testimony during trial, somebody who admitted on the stand that his natural instinct is to lie, somebody who admitted that he thinks he can talk his way out of things. But that's what the defense is asking you to do. That's desperate, ladies and gentlemen.

The prosecutor is "entitled to make reasonable comments on the evidence and [urge] such inferences from the testimony as will support his theory of the case." *Atkins*, 290 A.3d at 484 (alteration in original) (quoting *Irby v. United States*, 464 A. 2d 136, 140 (D.C. 1983)).  When understood in context, the prosecutor's statements that Mr. Young had an inclination to lie were limited to describing the circumstances in which Mr. Young had acknowledged he lied to officers in order to avoid prosecution.  As such, the prosecutor's statements were not improper because the prosecutor did not misstate or mischaracterize evidence.  *Shepherd*, 144 A.3d at 561-64 (discussing how the misstatement of evidence is improper); *Coreas v. United States*, 565 A.2d 594, 602 (D.C. 1989) ("The prosecutor will exceed the line of permissible comment on the evidence by misstating or mischaracterizing the evidence.").  Likewise, the prosecutor's statements were not improper because the statements did not engage in impermissible speculation or argue facts not in evidence.  *Matthews v. United States*, 13 A.3d 1181, 1189 (D.C. 2011) ("The prosecution's theory is thus supported by rational inferences from the evidence and did not extend into 'impermissible speculation.'"  (quoting *Clayborne v. United States*, 751 A. 2d 956, 969 (D.C. 2000)));  *cf. Lee v. United States*, 668 A.2d 822, 830 (D.C. 1995) ("We therefore conclude that the prosecutor argued facts not in evidence, and that the opening of his rebuttal argument was improper.").  Because

the prosecutor's statements during closing were not improper, it was not error, nor plain error, for the trial court to permit them.

## 2. Prosecutor's Statements During Rebuttal Argument

Appellants argue that the prosecutor injected his personal evaluations and opinions about Mr. Young's credibility when he described Mr. Young's self-defense theory, along with all of Mr. Young's other testimony, as "self-serving." Appellants highlight the specific statement: "And then Mr. Young gets on the stand and makes these self-serving statements about how it was self-defense and tries to match it up with all the evidence that's been introduced, all the evidence that he's heard."[10] Appellants suggest that the prosecution's rebuttal comments "inhibited" the jury's ability to consider the evidence Mr. Young presented. We have held that "[c]ounsel may not express a personal opinion as to a witness's credibility or veracity because [i]t is for the jury to decide whether a witness is truthful and an attorney may not inject personal evaluations and opinions as to a witness'[s] veracity." *Andrade*, 88 A.3d at 140 (second and third alterations in original) (internal quotation marks omitted) (quoting *Diaz v. United States*, 716 A.2d 173, 179 (D.C. 1998)). However, this comment by the prosecution does not amount to an expression of opinion regarding Mr. Young's truthfulness. Considering this comment in its full context,

---

[10] Appellant did not object to this statement at trial, so we review for plain error. *Otts*, 952 A.2d at 161.

the prosecution later clarified that Mr. Young, on three separate occasions, stated that Mr. Shelton was not shooting. There was additional testimony by Ms. McRae that Mr. Shelton did not have a gun, and Ms. Liverpool, before the grand jury, said she did not see Mr. Shelton with a gun. Accordingly, in this context, the prosecutor's statement was reasonable as it was based on evidence that contradicted the self-defense theory, and not just a personal opinion regarding Mr. Young's credibility.

## B. Preserved Objections to the Prosecutor's Statements

Appellants argue that the prosecutor inappropriately displayed a photograph of Mr. Shelton and his wife, previously admitted into evidence, while playing audio of a phone call Mr. Young made to his mother purportedly talking about Mr. Shelton during rebuttal. Appellants allege that this display inflamed the jury's emotions because it was a "sympathetic photograph" of Mr. Shelton.[11] The government contends that displaying the photograph was not misconduct because it was being used to place the phone call in context. Alternatively, the government argues that, if there were misconduct, appellants cannot demonstrate "substantial prejudice"

---

[11] Mr. Height's trial counsel objected to the photo being displayed arguing it was being done to inflame the passions of the jury. He also renewed a motion for severance. The trial court ordered the prosecution to take the photo down and move on, and denied Mr. Height's renewed motion for severance. Neither appellant asked for a curative instruction.

because the case against Mr. Young was strong and the trial court instructed the jury that arguments by the lawyers are not evidence.

We need not decide whether the trial court erred in permitting the photograph to be shown to the jury because appellants have not established that they were substantially prejudiced. *See Freeman v. United States*, 689 A.2d 575, 586 (D.C. 1997) (resolving a claim of prosecutorial error on substantial prejudice). Even if the sole purpose behind showing the photograph was to elicit sympathy from the jury— as opposed to contextualizing the audio being played—it is not plausible that the photograph "substantially swayed" the outcome of trial. First, the photograph was not central to appellants' guilt or innocence, nor was it graphic or inflammatory, and the trial court promptly ordered its removal after sustaining Mr. Height's objection. *Cf. Chatmon v. United States*, 801 A.2d 92, 101 (D.C. 2002) (use of "gory" pictures that caused jurors to "divert their eyes"). Next, the government's evidence against appellants was formidable, resting largely on the credibility of several witnesses, and it is unlikely that the photograph played any considerable role in determining which statements were credited or rejected. Finally, appellants declined to ask for a curative instruction after the objection was sustained, suggesting that they did not view the photograph as having a serious risk of swaying the verdict. Accordingly, any resulting error was harmless.

Appellants also challenge the propriety of the prosecutor's comment on the audio of a call during which Mr. Young complained that Mr. Height was putting the "bones" on him. The prosecutor questioned, "Whose bones could [Mr. Young] be referring to, ladies and gentlemen? William Shelton's bones." Because appellants raised an objection to this statement, we review for abuse of discretion. *Robinson v. United States*, 50 A.3d 508, 530 (D.C. 2012) ("In considering claims of improper argument, 'it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel.'" (quoting *Gilliam v. United States*, 46 A.3d 360, 366 (D.C. 2012))). The prosecutor's statement was reasonable as it was based on the audio and the government's evidence that Mr. Young killed Mr. Shelton. *See Matthews*, 13 A.3d at 1189 n.7 (affirming that the government is permitted to discuss its theory of the crime during closing by use of inferences from evidence). Thus, there was no abuse of discretion by the court in allowing the statements during closing.

## VI. Knowledge of Prohibited Status as an Element of Unlawful Possession of Firearm Charge

Mr. Height argues that his conviction for unlawful possession of a firearm under D.C. Code § 22-4503 violated his Fifth and Sixth Amendment rights. He contends that the indictment failed to allege an element of the offense: his knowledge

of his prior conviction for a crime punishable by imprisonment for a term exceeding one year. Mr. Height acknowledges his claim is subject to a plain error review.

In our recent decision in *Atkins*, 290 A.3d 474, we denied a plain error challenge to a conviction under § 22-4503 where, "[a]ssuming without deciding the District's statute plainly requires such a [showing of knowledge] and a corresponding instruction," the appellant "d[id] not sufficiently dispute his felony status and d[id] not proffer representations that would support his position that he was unaware of his felony status at the time of the charged incident." *Atkins*, 290 A.3d at 481-82. We further deemed it relevant whether appellant stipulated to a felony conviction at trial. *Id.* at 482. The same considerations are present here. Even assuming we should interpret the felon-in-possession statute as Mr. Height urges, Mr. Height stipulated at trial that prior to the date of the offense he "had been convicted of a crime punishable by imprisonment for a term exceeding one year." Therefore, the knowledge element of the statute would be satisfied; there is no dispute over whether Mr. Height was "unaware of his felony status." *Id.* Mr. Height offers no reason for us to disregard this stipulation and its consequences. Instead, he rests solely on legal arguments concerning how to interpret § 22-4503. However, even under his preferred reading, there was still sufficient evidence of this mens rea element to convict and, therefore, there was no plain error under *Atkins* that compels reversal. *See Greer v. United States*, 141 S. Ct. 2090, 2099-2100 (2021) (holding

that the failure to instruct a jury as to the mens rea element does not constitute a structural error that warrants automatic reversal). Accordingly, we affirm Mr. Height's conviction for unlawful possession of a firearm.[12]

## VII. Other Joint Challenges Raised

### A. Scope of the Government's Redirect Examination of Witness Tiera Liverpool

#### 1. Additional Factual Background

Ms. Liverpool testified during trial pursuant to an immunity letter provided by the government shielding her from prosecution for perjury or obstruction of justice based on her testimony before the grand jury.[13] However, she could be prosecuted if she lied at trial.

Before the grand jury, Ms. Liverpool testified that, prior to the shooting, the second man had told Mr. Young to check Mr. Shelton's pockets, and that Mr. Young "didn't want to check his pockets, but he kept asking him where the money was at

---

[12] Mr. Height failed to make an adequate showing under *Atkins*. Therefore, we decline to reach his further arguments about whether § 22-4503 contains a mens rea element requiring proof that he knew of his prior conviction.

[13] We walk through the grand jury testimony introduced during the trial for the sole purpose of determining whether the trial court correctly permitted the government to ask Ms. Liverpool about Gooney Mooney on redirect. Neither Mr. Young nor Mr. Height has raised any challenge on appeal to the trial court's admission of this grand jury testimony. Therefore, we consider any evidentiary challenges waived.

. . . [in] a more demanding tone." She testified that she believed Mr. Shelton was present to buy drugs, but Mr. Shelton was telling Mr. Young he did not have any money. She then testified that it seemed that Mr. Young and Mr. Height were trying to rob Mr. Shelton based on the argument between the men over money. She testified that the verbal exchange escalated.

Ms. Liverpool further testified that on the morning of August 31, 2014, she heard more than five gunshots while smoking in her apartment window, which faced the front side of the apartment building. She implicated two men in the shooting, including Mr. Young, whom she identified by name, and said was holding a gun. She testified that when the two men entered the building, she heard them speaking in the hallway. She heard Mr. Young say, "you didn't have to shoot him first," to which the other man replied, "you should have just checked his pockets." She also testified that she saw Mr. Young with a gun and that Rose Miller's apartment was "the only place you can go in that building" because the "building has no outlets[.]".

At trial, Ms. Liverpool recanted almost all of her grand jury testimony, instead testifying that she saw two men enter her building after the shooting and retracting her identification of Mr. Young. The government impeached Ms. Liverpool repeatedly with her grand jury testimony. Ms. Liverpool further testified that she lied before the grand jury because she felt pressure from "somewhere" to do so and someone told her what to say at the time. When asked why her testimony changed,

she stated: "It changed because I had to come to a conclusion and just tell the truth about what I seen, which I seen two males and that was it. But, other than that, it was told to me. So, that's why I said what I had said." Ms. Liverpool admitted on the witness stand that people had contacted her after her grand jury appearance and she was getting pressure from the neighborhood.[14] She testified that the pressure she was receiving occurred as recently as the week before her trial testimony.

On cross-examination, appellants asked Ms. Liverpool about what she did or did not witness. She testified that she did not see Mr. Young on August 31, 2014, did not see him shoot anyone, and did not hear his voice after the shooting regarding checking Mr. Shelton's pockets.

On re-direct the prosecution sought to ask Ms. Liverpool about "Gooney Mooney," a person Ms. Liverpool previously told the government was regularly going to the trial (allegedly on behalf of Mr. Young) and communicating with her at her place of work.[15] The prosecution expected that Ms. Liverpool would lie about

---

[14] The trial court gave a curative instruction to the jury regarding pressure from people in the neighborhood. The trial court stated, "Also, you've heard evidence that maybe Ms. Liverpool felt some pressure from people in the neighborhood; you may not attribute that to Mr. Young or to Mr. H[e]ight. There is no information that supports they're responsible for that, and you may not infer that in any way, shape or form."

[15] The trial court barred the government from introducing evidence to the jury suggesting a connection between Gooney Money and appellants.

Gooney Mooney attending trial and it would then call a police officer to impeach her and testify that Gooney Mooney had been attending. Mr. Young's counsel objected to the questioning as outside the scope of cross-examination because counsel "never asked her anything about talking to anybody since she started testifying." Mr. Height's counsel separately vocalized a concern about how the potential witness tampering would have a "spillover effect" on Mr. Height, who was not connected to Gooney Money.

The court overruled appellants' objection and permitted the government's inquiry. The court opined it was appropriate in light of Ms. Liverpool's change in position at trial in comparison to her grand jury testimony. On re-direct, Ms. Liverpool testified that she worked with Gooney Mooney and that he talked to her about her testimony, but she denied that Gooney Mooney had been attending trial. Appellants did not request to re-cross-examine Ms. Liverpool.

## 2. Analysis

Appellants argue on appeal that the trial court abused its discretion in allowing the prosecution to ask Ms. Liverpool about Gooney Mooney on re-direct because it exceeded the scope of cross-examination. We conclude that the trial court erred in permitting the line of inquiry into Gooney Mooney on re-direct because it was

outside the scope of cross-examination.[16]   However, the error was ultimately harmless.

"[T]he scope of the redirect examination is limited to matters which were first raised on cross-examination, to which the opposing party is merely responding." *Green v. United States*, 209 A.3d 738, 741 (D.C. 2019) (quoting *Singletary v. United States*, 383 A. 2d 1064, 1073 (D.C. 1978)).  "It may therefore explain, avoid, or qualify the new substantive facts or impeachment matters elicited by the cross examiner."  *Rose v. United States*, 879 A.2d 986, 993 n.3 (D.C. 2005) (internal quotation mark omitted) (quoting *Brown v. United States*, 763 A.2d 1137, 1140 (D.C. 2000)).  "The scope of redirect examination rests within the sound discretion of the trial court and will not be reversed absent a showing of clear abuse." *Harrison*

---

[16] We summarily deny Mr. Young's argument that his Sixth Amendment Confrontation Clause rights were violated because he was not able to re-cross Ms. Liverpool on the "new issues" raised during the redirect examination.  Assuming *arguendo* that the government's redirect raised a new issue, which we doubt, Mr. Young failed to preserve this issue because he did not seek to re-cross Ms. Liverpool at trial.  *Tyer v. United States*, 912 A.2d 1150, 1158 n.6 (D.C. 2006) ("[T]he trial court cannot be faulted for denying a request that was never made."); *see id.* (concluding that appellant preserved the issue of the denial of a request to re-cross for appeal despite counsel's failure to request permission to re-cross at trial only because trial counsel later moved to strike the testimony from the record as inadmissible).  We also decline to review appellants' Sixth Amendment argument as cursory.  *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n.9 (D.C. 2001) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (quoting *United States v. Zannino*, 895 F.2d 1, 16 (1st Cir. 1990))).

*v. United States*, 60 A.3d 1155, 1168 (D.C. 2012) (quoting *Hairston v. United States*, 467 A. 2d 1097, 1103 (D.C. 1985))

The trial court erred in allowing the government to redirect Ms. Liverpool with questions about Gooney Mooney. The government was not surprised by the change in her testimony and had the opportunity, on direct examination, to elicit the testimony about Gooney Mooney to support its explanation for why Ms. Liverpool's testimony changed at trial. Further, neither appellant raised the issue on cross-examination. *See Brown*, 763 A.2d at 1140 ("[R]edirect examination is limited to matters which were first raised on cross-examination, to which the opposing party is merely responding on direct." (alteration in original) (quoting *Dobson v. United States*, 426 A.2d 361, 365 (D.C. 1981))). However, the trial court's decision to allow the questioning about Gooney Mooney on redirect examination was harmless because it had already been established that Ms. Liverpool had been pressured to change her testimony between the grand jury and the trial; Ms. Liverpool's grand jury testimony was corroborated by other evidence; and the trial court gave a limiting instruction prohibiting the jury from attributing any pressure to the appellants. The government's questions about Gooney Mooney also went to Ms. Liverpool's credibility, a permissible subject matter for redirect. *Brown*, 763 A.2d at 1140.

## B.     Jury Note Concerning Definition of "Intent"

### 1.     Additional Factual Background

On April 4, 2018, during deliberations, the jury sent a note to the court asking, "What is the definition of intent[?]" The jury did not specifically reference any count to which its question pertained. The government agreed with the trial court's suggestion to refer the jury back to the state of mind instruction, *Criminal Jury Instructions for the District of Columbia*, No. 3.101 (5th ed. 2018), on which the jury had been originally instructed. Counsel for Mr. Height agreed that under the circumstances the state of mind instruction was appropriate. Likewise, counsel for Mr. Young agreed that the trial judge should re-read the state of mind instruction for the jury. The trial judge reinstructed the jury as such.[17]

---

[17] The exact state of mind instruction given by the court in response to the jury's note was:

> Someone's intent or knowledge ordinarily cannot be proved directly because there is no way of knowing what a person is actually thinking, but you may infer someone's intent or knowledge from the surrounding circumstances. You may consider any statement made or acts done by James Young and Tyrone Michael H[e]ight in all of the facts and circumstances that were received in evidence. You may infer, but you're not required to infer, that a person intends the natural probable consequences of the acting he intentionally did or did not do. It is entirely up to you, however, to decide what facts to find from the evidence that's received during this trial. So you should consider all of the circumstances in evidence that you

## 2. Analysis

Neither Mr. Young nor Mr. Height objected to this jury instruction at trial, so we review for plain error.

Appellants argue that the jury instruction was error because it failed to respond to the jury's specific question about the definition of intent by failing to define the term. However, both Mr. Young and Mr. Height agreed to this jury instruction at trial, thus inviting the error and waiving any right to raise the claim on appeal. *See Masika v. United States*, 263 A.3d 1070, 1077 (D.C. 2021) (an appellant waives their claim of instructional error when they affirmatively agree to the instruction, thus inviting the error). *See also Buskey v. United States*, 148 A.3d 1193, 1204 (D.C. 2016) (appellants invited the error by "aiding-and-abetting instructions they now deem. . . error." (citing *Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007))). Further, the invited error doctrine "precludes a party from asserting as error on appeal a course that [they have] induced the trial court to take." *Preacher*, 934 A.2d at 368 (citing *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 183-184 (D.C. 1993)). Thus, this court is precluded from reviewing the claim of instructional

think are relevant in determining whether the government has proven beyond a reasonable doubt that James Young and Tyrone Michael H[e]ight acted with the necessary state of mind.

error. *Butts v. United States*, 822 A.2d 407, 416 (D.C. 2003) (this court has repeatedly held that a defendant may not take one position at trial and a contradictory one on appeal and, thus, this court is precluded from considering an instructional error argument where defense counsel agreed during the conference on instructions).

Mr. Young argues, however, that the court should still consider the claim because it falls into an exception to the invited error doctrine. The exception is such that reversible error occurs when the trial court does not dispel jury confusion about a central aspect of applicable law with concrete accuracy. *Preacher*, 934 A.2d at 368. Young contends that the trial court's response to the jury question was clear error because rereading the state of mind instructions could not dispel confusion. However, Mr. Young's claim does not fall into any such exception to the invited error doctrine. While it is true that the trial court has an obligation to "respond appropriately" to jury questions, *Alcindore v. United States*, 818 A.2d 152, 155 (D.C. 2003), "[i]n some cases, the nature of the question asked or the confusion expressed may be such that simple referral to the original instructions is appropriate." *Ivey v. District of Columbia*, 46 A.3d 1101, 1108 (D.C. 2012). This is so "because the judge knows that the answer to the question is readily to be found there or that rereading the instructions is likely to clear the confusion." *Id.*

Here, although Mr. Young contends the reinstruction likely confused the jury by failing to explain the different standards applicable to general and specific intent

crimes, we have specifically approved of the use of the state of mind instruction with respect to specific intent crimes and see no basis on which to depart from that approval here. *See Walden v. United States*, 19 A.3d 346, 348-50 (D.C. 2011) (approving of the state-of-mind instruction with respect to first-degree murder); *see also Perez Hernandez v. United States*, 286 A.3d 990, 1000 (D.C. 2022) (en banc) (recognizing this court's past criticism of the general and specific intent framework). We have also specifically approved of reinstructing the jury with the original instruction when such instruction contains the pertinent information.[18] *Graham v. United States*, 703 A.2d 825, 832 (D.C. 1997). As such, reinstruction with the state of mind instruction was an appropriate response. Further, the trial court noted to counsel after instructing the jury that, "I do believe [the jury is] having an epiphany right now. I do think they are having an epiphany." While it is unclear whether that comment was made in response to the state-of-mind instruction or the other instruction the trial court provided at the time, the jury's observed reaction is suggestive that the instruction adequately cleared the confusion. Thus, we conclude

---

[18] To the extent the trial court's reinstruction differed slightly from its original instruction, we do not view that distinction as relevant on these facts.

that Mr. Young's claim does not fall into an exception to the invited error doctrine and, as such, the right to raise it on appeal has been waived.[19]

## C. Cumulative Errors

Mr. Young argues that the trial court's cumulative errors warrant reversal and remand for a new trial. He asserts that the errors affected "critical issues at trial." The government argues that there were no errors warranting reversal on their own, and that the cumulative effect of any errors does not require reversal because appellants were not prejudiced.

In *Hagans v. United States*, this court determined that "the strength of the government's case and the innocuousness . . . of the few errors we have found or assumed arguendo convinces us that, even in combination, and even applying a *Chapman* standard across the board, there is no reasonable possibility the errors affected the outcome of appellants' trial." 96 A.3d 1, 43-44 (D.C. 2014). That is the case in the present circumstance as well. Although Mr. Young asserts numerous errors before the trial court, here we have concluded that there were no prejudicial errors that warrant reversal. Consequently, the cumulative effect of any such errors

---

[19] Mr. Young also argued that the court should have instructed the jury to ask additional questions. However, we conclude that the court's failure to so instruct the jury did not substantially affect Mr. Young's rights. *Olano*, 507 U.S. at 734.

did not prejudice Mr. Young.  As such, Mr. Young is not entitled to reversal on this ground.

## VIII.  Challenges Raised Only by Appellant Height

### A.      Denial of Pre-Trial Motion to Suppress GPS Evidence

#### 1.          Additional Factual Background

Amongst the evidence introduced against Mr. Height at trial was GPS data derived from a monitor that Mr. Height was wearing as required by the Court Supervision and Offender Services Agency ("CSOSA") as a condition of his release in a previous case.  This GPS evidence placed him in the vicinity of Wellington Park at the time of the shooting.  MPD was able to access the GPS tracking database because of an existing Memorandum of Understanding between MPD and CSOSA.

Prior to trial, Mr. Height moved to suppress this and other evidence derived from the GPS data as a violation of his Fourth Amendment rights.  The trial court denied his motion, concluding that when Mr. Height was fitted with the GPS device he signed a contract acknowledging that his movements would be monitored, tracked, and stored by CSOSA, and as such his reasonable expectation of privacy was diminished.  The trial court also concluded that: (1) the purpose of MPD's search of the GPS data was not to target a particular person; (2) the search was tailored to fit MPD's investigatory needs, because it was limited to the area of the

murder and set an exact frame of four hours aligning with the events; and (3) any intrusion on Mr. Height's privacy was minimal when weighed against the government's interests. Moreover, the trial court determined that the location information inevitably would have been discovered because a witness had come forward identifying Mr. Height as present at Wellington Park at the time of the shooting and the government subpoenaed CSOSA to produce the GPS information for Mr. Height.

## 2.    Analysis

On appeal, Mr. Height argues that the trial court erred in denying his motion because there was an unreasonable search in violation of the Fourth Amendment. In addition, he contends that the use of the tracking device contravened CSOSA's internal policies because it was placed on him merely as a result of failed drug tests and because CSOSA lacked justification for keeping him on GPS monitoring after a 30-day period. The parties disagree over whether Mr. Height adequately preserved his complaint about the alleged violation of CSOSA's regulations, and thus what is the appropriate standard of review.

Generally, when the government "attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements," it conducts a search. *United States v. Jackson*, 214 A.3d 464, 472 (D.C. 2019) (quoting

*Grady v. North Carolina*, 575 U.S. 306, 309 (2015)). The government's use of the device to monitor the person's movements also constitutes a search. *Id.* Under the Fourth Amendment's protection against unreasonable searches and seizures, we are tasked with determining whether CSOSA's GPS monitoring of Height was reasonable.

To determine whether a search was reasonable, we assess the "totality of the circumstances," which includes "the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady*, 573 U.S. at 310. When reviewing a trial court's ruling on a motion to suppress, "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Plummer v. United States*, 983 A.2d 323, 330 (D.C. 2009). We review de novo the denial of a motion to suppress GPS data on Fourth Amendment grounds. *Jackson*, 214 A.3d at 471.

Mr. Height does not dispute that he violated his conditions of supervision. We have previously acknowledged that CSOSA "probationers . . . are on notice and agree that they will be subject to intensive and intrusive supervision, specifically including GPS monitoring, if there is reason to believe they are . . . otherwise violating the conditions of their release." *Jackson*, 214 A.3d at 478. Although Mr. Height attempts to characterize his violations as mere "technical violations," which there is reason to doubt, that characterization would not justify a departure from

*Jackson*.   Further, the Fourth Amendment allows significant intrusion on a probationer's privacy because their reasonable expectation of privacy is diminished and outweighed by the heightened governmental interest in deterring re-offending and promoting rehabilitation. *See id.* at 475.  Accordingly, we conclude that CSOSA was permitted to place Mr. Height on GPS monitoring.

In *Jackson*, we also explained that "CSOSA did not violate [a defendant's] reasonable expectation of privacy by granting the police access to his GPS tracking data in furtherance of their mutual law enforcement objectives.  The limited police utilization of that access comported with the reason CSOSA granted it and did not unreasonably intrude on [defendant's] privacy." *Id.* at 486.  We concluded that such an expectation was not reasonable where CSOSA and MPD had a Memorandum of Understanding ("MOU") under which the two agencies shared data.[20]  *Id.* at 482-3. In addition, "CSOSA made no secret of its sharing of GPS monitoring data with the police . . . .  CSOSA publicized on its website the MPD's use of its GPS tracking data to 'aid in suspect apprehension.'"  *Id.* at 483.  Furthermore, the information CSOSA shared with the police was limited in scope and properly used as part of an

---

[20] The MOU at issue in *Jackson* explained that "CSOSA and the MPD share a common mission to reduce and prevent crime, and that a purpose of their two-way automated and routine data sharing arrangements is to enhance CSOSA's ability to prevent supervised offenders from engaging in criminal activity, thereby reducing recidivism and improving public safety, in accord with the agency's mission." *Jackson*, 214 A.3d at 482 (internal quotation marks omitted).

investigation. *Id.* at 485. We have since confirmed in *Atchison v. United States* that the use of GPS data obtained by CSOSA in this manner does not violate the Fourth Amendment. 257 A.3d 524, 529-31 (D.C. 2021).

Mr. Height further argues that CSOSA violated its own regulations when it placed the monitor on him. Mr. Height states that CSOSA policy does not permit GPS monitoring for positive drug tests and that his monitoring exceeded the time limit. However, Mr. Height misrepresents CSOSA's policy statement when he asserts that it "does not permit GPS monitoring for positive drug tests." The policy, in fact, states that: "[o]ffenders testing positive for the drug PCP shall be immediately sanctioned with GPS." CSOSA Global Positioning System ("GPS") Tracking of Offenders, Policy Statement 4008(A)(3)(g) (csosa.gov 2009). The policy also allows CSOSA to extend tracking for up to a total of 90 days when there are aggravating circumstances, such as positive drug tests. *Id.* at 4008(A)(3).

Thus, Mr. Height has not shown that CSOSA violated its own regulations. Moreover, he has not established as a legal matter that an agency's violation of its own regulations would justify use of the exclusionary rule. *See United States v. Caceres,* 440 U.S. 741, 755 (1979) (overturning order suppressing evidence obtained in violation of IRS regulations; "our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case"). For all these reasons, we affirm the denial of the motion to suppress.

### B. Admissibility of Testimony Regarding Height's Possession of a .40-Caliber Firearm

### 1. Additional Factual Background

Prior to trial, the government filed a motion in limine seeking to introduce the testimony of Reynaldo Mora, an individual who had met Mr. Height the day after Mr. Shelton was shot. The government's proffer was that Mr. Mora's testimony would provide evidence that on the day after Mr. Shelton was shot, Mr. Height possibly possessed a black .40 caliber handgun. Mr. Height opposed the motion on the grounds that the testimony constituted impermissible other crimes evidence, rather than testimony demonstrating his "possession of the means to commit" Mr. Shelton's murder. The trial court granted the motion over Mr. Height's opposition. At trial, during the government's case-in-chief, it introduced a stipulation concerning the testimony that Reynaldo Mora would have provided if he were called to testify at trial. In relevant part, this stipulation provided that:

> During the early morning hours of September 1, 2014, Reynaldo Mora met a group of young men from Southeast, Washington, D.C. . . . in Landover, Maryland.
>
> [. . .]
>
> Mr. Mora and one of the individuals who had been with him at the [music] studio had a discussion outside of Mr. Mora's car. Mr. Mora later identified this individual as the defendant, Michael [Height], from photographs that police displayed to Mr. Mora.

[. . .]

[H]e does recall spending several hours with this individual at the recording studio in Bowie.

During this interaction, Mr. Mora, who was face to face with the individual that he later identified as Defendant [Height], saw the individual with a black object which Mr. Mora believed to be a .40-caliber handgun.

Mr. Mora believed that the black object may have been a firearm because the individual appeared to retrieve it from his back waist area, and made statements that Mr. Mora interpreted to mean that the individual had a gun.

According to Mr. Mora, he saw a black object that he believed to be a pistol grip. Mr. Mora thought the object was a .40-caliber gun because of the size of the black object as well as the fact that the individual had been rapping about .40-caliber guns while recording inside the studio.

Mr. Mora only saw the black item briefly, and he cannot say with certainty that it was a firearm.

## 2. Analysis

On appeal, Mr. Height reasserts the arguments he raised before the trial court that Mr. Mora's testimony was evidence of other crimes, i.e., possession of the firearm—an uncharged crime. "We review a trial court's evidentiary decisions for abuse of discretion, and in doing so, broadly defer to the trial court due to its 'familiarity with the details of the case and its greater experience in evidentiary matters.'" *Johnson v. United States*, 960 A.2d 281, 294 (D.C. 2008) (citation

omitted). This deference particularly applies where the trial court must consider the relevance and potential prejudice of the evidence, under a Rule 403 assessment. *Id.* We "evaluate the trial court's decision from its perspective when it had to rule and [do] not indulge in review by hindsight." *Id.* at 295 (quoting *Old Chief v. United States*, 519 U.S. 172, 182 n.6 (1997)).

We conclude that the trial court did not abuse its discretion in granting the motion in limine. First, the trial court correctly concluded that Mr. Mora's identification of Mr. Height was admissible evidence. "Evidence of an uncharged crime is inadmissible for the purpose of proving the defendant's criminal disposition to commit the type of offense for which the defendant is on trial." *Hagans*, 96 A.3d at 29. However, Mr. Mora's testimony "was not offered or admitted for such an improper purpose." *Id.* Rather, the testimony was introduced for the legitimate purpose of proving possession of a weapon that had recently been used to commit the charged crimes. *Id.*; *see, e.g.*, *Jenkins v. United States*, 80 A.3d 978, 999 (D.C. 2013) (upholding admission of evidence that defendant had committed an uncharged homicide with the same weapon used eight days later to commit the murder for which the defendant was on trial); *Jones v. United States*, 27 A.3d 1130, 1146 (D.C. 2011) (upholding, in prosecution for murder, admission of evidence that the defendant had used the murder weapon to commit an uncharged armed robbery). "A defendant's possession of a weapon not long before or after it was used to commit a

homicide for which he is on trial 'is some evidence of the probability of his guilt, and is therefore admissible.'" *Hagans*, 96 A.3d at 29 (citing *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000)).

As Mr. Height argues, "[a]dmissible evidence may [still] be excluded . . . if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* However, the trial court did not abuse its discretion in determining that the probative value of Mr. Mora's identification was not substantially outweighed by the danger of unfair prejudice. The trial court noted that the probative value of the testimony was that Mr. Height had the means to commit the murder shortly after the shooting. The trial court also noted there was prejudice because of the questionable reliability of Mr. Mora's testimony due to the changes to and uncertainty in Mr. Mora's statements during two different interviews with police. For example, Mr. Mora was less than certain Mr. Height had a .40 caliber handgun. Even so, the trial court was in a better position to assess the relevance and potential prejudice at the time Mr. Mora's testimony was proffered. Further, Mr. Mora's testimony was ultimately presented to the jury as a stipulation, approved by Mr. Height, which included qualifiers about the certainty of Mr. Mora's identification of the weapon. The stipulation omitted evidence that Mr. Height had pistol-whipped Mr. Mora and threatened to kill him. Accordingly, we conclude that the trial court did not abuse

its discretion in determining that the introduction of the evidence was not substantially more prejudicial than probative.

## C. Denial of Pre-Trial Motion to Suppress Out-of-Court Identification of Height

### 1. Additional Factual Background

Mr. Height also moved to suppress out-of-court identifications made by Mr. Mora to Detective Tyler. Mr. Mora first identified Mr. Height when Detective Tyler presented Mr. Mora with a single photograph of Mr. Height. This photo presentation occurred after MPD used Mr. Height's GPS tracking data to follow him, but made contact with Mr. Mora instead of Mr. Height. In response to seeing Mr. Height's photo, Mr. Mora identified Mr. Height as someone who had assaulted him the morning of September 1, 2014. The second identification took place during an interview with Mr. Mora at MPD's homicide branch when Mr. Mora was asked to confirm in a recorded interview whether the photograph of Mr. Height depicted the individual who had assaulted him that morning. The third identification occurred after an interview with a Prince George's County detective when Mr. Mora provided a description of the person who assaulted him that morning and then selected Mr. Height's photograph from an array of six photos. At the time of the identifications, Mr. Height was not a suspect in the murder of Mr. Shelton, but a person of interest, perhaps a witness to the shooting.

## 2.     Analysis

On appeal, Mr. Height contends that, contrary to the trial court's conclusions, the single-photograph display was unduly suggestive, and that the trial court erred in determining that the identification was reliable.  The government argues that the display was not unduly suggestive, but that even if it was, the resulting identification was reliable.  "[S]uggestivity and reliability are mixed questions of law and fact.  We review mixed questions of law and fact under our usual deferential standard of review for factual findings . . . and [apply] de novo review to the ultimate legal conclusions based on those facts."  *Hilton v. United States*, 250 A.3d 1061, 1068 (D.C. 2021) (alterations in original) (citations, italics, and internal quotation marks omitted).  "This court is bound by the trial court's findings on whether identification procedures were impermissibly suggestive and whether an identification was reliable if they are supported by the evidence and in accordance with the law." *Kaliku v. United States*, 994 A.2d 765, 871 (D.C. 2010) (citation omitted).  An identification must be both impermissibly suggestive and unreliable to justify suppression on due process grounds.  *Hilton*, 250 A.3d at 1068.  We conclude that Mr. Height was not entitled to suppression because the identification of Mr. Height was reliable.

This court has previously held that a pretrial identification procedure which involved display of a single photograph was impermissibly and unnecessarily

suggestive. *Morales v. United States*, 248 A.3d 161, 172, 174 (D.C. 2021). In *Morales*, the witness was shown a single-mugshot photo of a standalone suspect four months after the witness "glimpsed" the suspect. *Id.* at 173. Importantly, in *Morales*, this court noted that "[a]sking a witness whether they can identify a standalone suspect—rather than picking him out from a lineup or photo array—is among the most suggestive and objectionable forms of pretrial identification because of the strong implication that the individual has been singled out as the suspect by law enforcement." *Id.* at 172 (citing *Patterson v. United States*, 384 A.2d 663, 666 (D.C. 1978)).

However, there is no rule of per se exclusion when a single photograph has been shown, *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977), and *Morales* is distinguishable from the present case in important ways. First, the witness in *Morales* only glimpsed the suspect four months prior to the identification procedure. *Id.* at 173. Here, as the trial court recognized, Mr. Mora had been associating with Mr. Height for some hours and the first identification happened only an hour or so after the assault on Mr. Mora.

Further, in *Morales*, the government needlessly displayed a single-mugshot during preparation for trial. *Morales*, 248 A.3d at 174 ("The government had every opportunity to conduct an appropriate and timely pretrial photo array or a lineup procedure . . . had it wished to do so."). Given the circumstances of the present case,

it is understandable that a photo array had not been prepared as the officers were attempting to find Mr. Height and, by their own admission, were not "investigating what happened to [Mr. Mora] in Maryland, [but] inquiring if [Mr. Height] was at the studio." Thus, the identification procedure was, arguably, not unnecessarily suggestive.

But even if we assume, without deciding, that the display of the single photograph was impermissibly suggestive, suppression would not be required. We have adopted the Supreme Court's five-factor totality test set forth in *Neil v. Biggers* to determine the reliability of an identification:

> (1) the witness's opportunity to observe the perpetrator at the time of the crime, (2) the degree of attention the witness paid to the perpetrator, (3) the accuracy of any prior descriptions of the perpetrator provided by the witness, (4) the level of certainty demonstrated by the witness at the time of the identification, and (5) the lapse in time between the crime and the identification procedure.

*Long v. United States*, 156 A.3d 698, 707 (D.C. 2017) (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.* (citation omitted).

The trial court determined that Mr. Mora had "great" opportunity to observe Mr. Height. Specifically, it concluded that there was a strong likelihood that Mr. Height and Mr. Mora spent an evening out together (based upon Mr. Mora's

recollection and the GPS information), including the time spent together at the studio; that Mr. Mora's initial identification of Mr. Height was because of their prior interaction and the face-to-face confrontation during the assault; that Mr. Mora was able to describe accurately Mr. Height's build and height, which could not be ascertained from the photos; and that Mr. Mora did not hesitate in identifying Mr. Height. The trial court also highlighted that there was only a limited passage of time between when Mr. Mora was pistol-whipped and Detective Tyler's presentation of the photo.

Mr. Height argues that Mr. Mora's identifications are not sufficiently reliable because the trial court ignored several significant facts in reaching its conclusion. Mr. Height asserts that the trial court ignored Mr. Mora's lack of focus and degree of attention at the time the pistol-whipping incident occurred. Mr. Height highlights that: Mr. Mora had been out partying all night and was dozing off shortly before the incident; there was no indication of how long the face-to-face altercation lasted; and Mr. Mora did not provide a description of his assailant before Detective Tyler produced the photo.

Although the facts outlined by Mr. Height contribute to our review of the totality of the circumstances, it was the trial court's function to weigh conflicting evidence, and we cannot say that its assessment was clearly erroneous or contrary to

law. We conclude that, for the reasons outlined by the trial court,[21] Mr. Mora's identification of Mr. Height was sufficiently reliable. Mr. Mora had several hours of time and close proximity to observe his assailant leading up to and at the time of the assault. Though Mr. Mora was assaulted by several men, he, without hesitation or equivocation, identified Mr. Height as the individual who pistol-whipped him. Further, this identification took place approximately one-hour after Mr. Mora was assaulted. Finally, Mr. Mora was able to accurately describe Mr. Height's build and height, before the photo array identification, even though the photo he was shown by Detective Tyler was a headshot. For these reasons, we conclude that Mr. Mora's

---

[21] Mr. Height argues in his supplemental brief that the trial court's conclusion that binding precedent required finding that the single photo display was not impermissibly suggestive was legally erroneous. The trial court cited *Melendez v. United States*, 26 A.3d 234 (D.C. 2011), to support the proposition that this court routinely upholds the practice of showing a witness a single photograph of an acquaintance or someone whom the witness had opportunity to focus on during the commission of the crime. Even if the facts of *Melendez* are not strictly comparable to what happened here, the trial court specifically recognized during that same discussion that "even when there is unnecessary suggestivity, due process is not offended when the identification is supported by indicia of reliability. That is the case here."

identifications of Mr. Height were sufficiently reliable.[22]  Accordingly, Mr. Height was not entitled to suppression of the out-of-court identifications by Mr. Mora.[23]

### D.      Denial of Pre-Trial Motion for Severance

Before trial, Mr. Height filed a written motion to sever based on the expectation that the government would introduce prior statements made by Mr. Young; the trial court denied the motion in a written order.  In his motion, Mr. Height appeared to rely upon both the Confrontation Clause of the Sixth Amendment and Super. Ct. Crim. Rule 14.  As it turned out, there was no confrontation issue because Mr. Young testified at trial.  Thus, on appeal, Mr. Height challenges the trial court's denial of severance solely on Rule 14 grounds.  *See Thomas v. United States*, 978 A.2d 1211, 1223 (D.C. 2009).  Mr. Height has preserved this claim by renewing it at the end of trial, so we review for abuse of discretion.

---

[22] This court in *Morales* noted that the first and fifth *Biggers* factors are of great importance to the determination of reliability.  248 A.3d at 177.  Here, the identification satisfies both: Mr. Mora had sufficient opportunity to view Mr. Height and it had only been an hour or so before the first identification took place.

[23] Appellant Height also moved to suppress Mr. Mora's identification of him from a photo array presented by detectives from Prince George's County who were investigating the assault that took place in Bowie.  He did not argue that the photo array was impermissibly suggestive, but rather that the resulting identification was tainted by the earlier display of a single photograph to Mr. Mora.  Because we have concluded that the earlier identification was reliable and admissible, there was no taint that would invalidate the identification made upon viewing the photo spread.

Even where there is no Confrontation Clause violation, "the opportunity to cross-examine does not operate to make [an otherwise inadmissible] incriminating extrajudicial statement admissible against the non-declarant co-defendant." *Thomas*, 978 A.2d at 1223 (alteration in original) (quoting *Carpenter v. United States*, 430 A.2d 496, 503 (D.C. 1981) (en banc)). There is a duty imposed on the trial judge by Criminal Rule 14 to "take appropriate steps to minimize the prejudice inherent in co-defendant confessions which are inadmissible against the nondeclarant defendant."[24] *Wynn v. United States*, 241 A.3d 277, 281 (D.C. 2020). This is true even when the declarant is available for cross-examination. *Matthews*, 13 A.3d at 1186. Some appropriate steps include, if feasible, "redact[ing] to

---

[24] Pursuant to Criminal Rule 14:

> [A] trial court may grant severance if it appears that a defendant will be prejudiced by joinder, but this discretionary authority is to be exercised with caution; in view of the strong policy reasons and longstanding presumption in favor of joint trials, a court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. We will reverse a trial court's denial of a motion for severance only upon a clear showing that it has abused its considerable discretion. To demonstrate such an abuse, an appellant must show manifest prejudice.

*Hagans*, 96 A.3d at 40 (brackets, citations, and internal quotation marks omitted).

eliminate all incriminating references to the [non-declarant] co-defendant" or granting the non-declarant co-defendant's motion for severance. *Wynn,* 241 A.3d at 282 (quoting *Thomas*, 978 A.2d at 1224). Alternatively, the government could choose to forego introducing the statement to avoid severance. *Id.* However, the trial court is relieved from its obligations under *Carpenter* if the co-defendant's statements "fall[] within an exception to the hearsay rule" such that they are admissible against the defendant. *Thomas*, 978 A.2d at 1224. Severance and exclusion are not required "if the evidence would be admissible against the defendant in a separate trial." *Ashby*, 199 A.3d at 657.

Mr. Height identifies three statements Mr. Young made that allegedly implicated him and required severance. First, Mr. Young made a statement on September 3, 2014, when he was interviewed by the police. At the time, Mr. Young told police he was with "Darius," "Tay," and another person. He also told officers that Mr. Shelton was trying to buy PCP, and the other three men planned to sell Mr. Shelton fake PCP and rob him. Mr. Young was shown a photo array to identify the third man; it included Mr. Height's photo, but Mr. Young did not make an identification. Second, during a subsequent interview with police, which was recorded and played for the jury at trial, Mr. Young gave a description of the alleged shooter, stating that the person was wearing a shirt over his head, a white tank top and blue jeans, and was covering his face with one arm and extending the other while

shooting. At trial, Mr. Young confirmed that he gave this description. And third, during trial, the government introduced statements from Mr. Young during his interview that he did not have a Facebook page and that police would not see a photograph of him with the other shooter on that page, but then Mr. Young admitted that he had a Facebook page and that that Facebook page included old photographs of Mr. Young and Mr. Height together. Mr. Height suggests that Mr. Young's admissions equate to Mr. Young implicating him as the other shooter.

This court has instructed that a defendant's extrajudicial statement "may be admitted in evidence in a joint trial (with an appropriate limiting instruction . . .) so long as the statement . . . does not incriminate a non-declarant co-defendant *on its face*, either explicitly or by direct and obvious implication." *Thomas*, 978 A.2d at 1235 (citing *Riley v. United States*, 923 A.2d 868, 886 (D.C. 2007), and *Plater v. United States*, 745 A.2d 953, 960-961 (D.C. 2000)). Non-specific references to jointly tried co-perpetrators satisfy these conditions even when the non-declarant co-defendant may be linked to the statement by other, extrinsic evidence of their guilt. *Thomas*, 978 A.2d at 1235-1236. Here, none of Mr. Young's testimony explicitly implicates Mr. Height; none of the statements directly refer to Mr. Height in the context of the commission of the charged crimes. Mr. Young's statement to police that he was with "Darius," "Tay," and another person and his description of the shooter were both non-specific references. *See Thomas*, 978 A.2d at 1237 ("Even

when there is only one accomplice and only one co-defendant is on trial with the declarant, the use of a non-specific . . . pronoun is acceptable."). Likewise, none of Mr. Young's testimony implicates Mr. Height by "direct and obvious implication." *Id.* at 1235. None of Mr. Young's testimony refers to specific attributes that would be suggestive of Mr. Height. *See, e.g.*, *Matthews*, 13 A.3d at 1187-8 (concluding that a statement did not implicate a co-defendant by direct and obvious implication where there was no reference to the co-defendant by name or nickname); *Mobley v. United States*, 101 A.3d 406, 418 (D.C. 2014) (concluding a statement did not implicate a co-defendant by direct and obvious implication even though the declarant used a plural pronoun). The fact that Mr. Height may be linked to the statement by other evidence of his guilt is insufficient to require the trial court to sever Mr. Height's case. *Thomas*, 978 A.2d at 1235 ("A statement [that does not incriminate by direct and obvious implication] normally is admissible . . . even though it alludes non-specifically to the declarant's confederates and the non-declarant co-defendant may be linked to it by other, properly admitted evidence of his guilt."). Thus, the statements satisfy the conditions laid out in *Thomas* and did not require severance under Criminal Rule 14. However, the court in *Thomas* does emphasize that statements which meet the conditions may normally be admitted *with an appropriate limiting instruction*. *Thomas*, 978 A.2d at 1235. The trial court erred in not providing such instruction or exercising its remedial discretion. The error,

however, was ultimately harmless because the statements were merely cumulative in light of other evidence—GPS data and testimony from Ms. McCrae placed Mr. Height at the scene of the crime. *See Ingram v. United States*, 40 A.3d 887, 898 (D.C. 2012) (concluding that the non-confessing co-defendant was not prejudiced by the admission of a co-defendant's unredacted inculpating confession in a joint trial because there was overwhelming evidence presented by eyewitnesses).

## IX.   Merger

Appellants argue that under the Double Jeopardy Clause of the Fifth Amendment, various convictions should merge. Specifically, appellants argue that: (1) their conviction for second-degree murder while armed merges with their conviction for felony murder while armed; (2) their conviction for felony murder merges with the underlying felony (armed robbery); and (3) all four of their convictions for possession of a firearm during the commission of a crime of violence ("PFCV") merge. The government concedes the first two points and we agree. *Foreman v. United States*, 114 A.3d 631, 645 (D.C. 2015) ("When there is only one killing, the defendant may not be convicted of more than one murder." (quoting *Thacker v. United States*, 599 A.2d 52, 63 (D.C. 1991))); *Thacker*, 599 A.2d at 63 ("[F]elony murder convictions merge with the underlying felonies.").

However, the government only concedes that three of the four PFCV convictions merge, not all four convictions.  The government concedes that three PFCV convictions (for the predicate offenses of armed robbery (of Mr. Shelton)), felony murder while armed, and second-degree murder while armed should merge. *Terry v. United States*, 114 A.3d 608, 629 (D.C. 2015); *Hampleton v. United States*, 10 A.3d 137, 146 (D.C. 2010) ("We have, nevertheless, held 'that multiple PFCV convictions will merge, even if the predicate felony offenses do not merge, if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence.'" (quoting *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006))).  However, the government argues, and appellants do not challenge in their reply briefs, that the PFCV conviction resulting from the burglary of Ms. Miller's apartment does not merge because the burglary constitutes a subsequent criminal act resulting from a fresh impulse.  *See, e.g.*, *Barber v. United States*, 179 A.3d 883, 895 (D.C. 2018) ("In situations like this, the key consideration in determining whether multiple crimes for acts committed against one victim merge is whether 'the defendant can be said to have realized that he [or she] has come to a *fork in the road*, and [still] decides to invade a different interest[.]'" (alterations in original) (quoting *Ellison v. United States*, 919 A.2d 612, 615 (D.C. 2007))).  We agree with the government that Mr. Young and Mr. Height's entry into Ms. Miller's apartment is a subsequent act of violence and, therefore, the fourth PFCV conviction

should not merge with the other three. Appellants may thus stand convicted of two PFCV offenses.

The parties also disagree on how the trial court should be instructed to merge the convictions with respect to sentencing. The government argues that the remand should include instructions for the trial court to "effectuate its original sentencing plan." Citing to *Bonhart v. United States*, Mr. Young contends that the trial court should retain discretion over resentencing because it may choose between several alternatives concerning the merger of offenses. 691 A.2d 160, 164 (D.C. 1997); *see Mooney v. United States*, 938 A.2d 710, 721 n.12 (D.C. 2007) (discussing remand options under *Bonhart*). We agree that the trial court retains discretion during sentencing either to (1) vacate the first-degree felony murder conviction and sentence Mr. Young and Mr. Height for both second-degree murder while armed and armed robbery or (2) vacate the second-degree murder while armed and armed robbery convictions. Depending on how the trial court exercises this discretion, appellants' sentences may differ from their original sentences. We remand accordingly.

## X.    Conclusion

In sum, we conclude that: (1) there was sufficient evidence to support appellants' convictions for felony murder while armed and second-degree murder while armed; (2) the trial court did not commit reversible error in ruling on various evidentiary and legal challenges; and (3) various of appellants' convictions merge. Accordingly, for the foregoing reasons, we affirm appellants' convictions but remand for the limited purpose of merging appellants' convictions and resentencing consistent with this opinion.

*So ordered.*